IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SANTANDER BANK, N.A., | ) |
| Plaintiff, | ) |
| v. | ) Case No. 1:13-CV-02519 |
| FRANCISCAN SISTERS OF CHICAGO SERVICE CORPORATION, | ) |
| Defendant. | ) |

**THE BANK'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**[1]

### I. ARGUMENT

**A. The Bank Is Entitled To Summary Judgment On Its Claim**

The Bank is entitled to summary judgment in its favor and against FSCSC because FSCSC has not satisfied its obligations under the Support Agreement, and it failed to pay its $3 million obligation thereunder upon the Bank's demand in January 2013. The elements of a claim for breach of contract are "(i) the existence of a valid and enforceable contract, (ii) performance by the plaintiff, (iii) breach of the contract by the defendant, and (iv) resultant injury to the plaintiff." *Coghlan v. Beck*, 2013 IL App (1st) 120891, ¶ 27 (1st Dist. 2013). The undisputed material facts satisfy each of these elements:

- The Support Agreement constitutes a valid and enforceable agreement. (D's Res. to P's SOF ¶ 9.)

- SMOW owed the Bank at least $10 million as of January 28, 2013 under the Reimbursement Agreement, thereby triggering FSCSC's obligation to pay the Bank $3 million under the Support Agreement. (D's Response to P's SOF ¶ 25.)

---

[1] Capitalized terms have the meanings given to them in Plaintiff's Motion and Statement of Material Facts ("P's SOF"). References to Plaintiff's Statement of Additional Facts are cited as "PSOAF ¶__."

- The Bank performed its obligations under the Support Agreement, sending notice to FSCSC under the terms of Section 3.2(b) on January 28, 2013. (D's Res. to P's SOF ¶ 28.)

- SMOW did not send, and the Bank never received, any written requests from SMOW to FSCSC requesting funds as required under Section 3.2(d) of the Support Agreement. (P's SOF ¶¶ 17, 18.)[2] Accordingly, the entire $3 million remains due and owing.

FSCSC claims, however, that it does not owe the $3 million sought by the Bank because (i) it was not responsible for providing the notice required under the Support Agreement (which somehow negates the ability of the Bank to enforce the terms of the Support Agreement as written), (ii) that the notice provisions in the Support Agreement were not material, as evidenced by the Bank's conduct with respect to the loan, and (iii) it allegedly satisfied its obligations under the Support Agreement by making payments in the amount of $3.7 million (despite the fact that FSCSC itself never accounted for a majority of these payments as being under the Support Agreement until well after the payments were made and after the loan was irretrievably in default). FSCSC's arguments are not sufficient to raise a genuine issue of material fact—they do not negate the fact (and FSCSC does not deny) that neither FSCSC nor SMOW complied with the terms of the Support Agreement. The Bank is entitled to judgment as a matter of law.

**B.     The Terms of the Support Agreement Entitle the Bank To Summary Judgment**

The Support Agreement requires compliance with its terms for any payments by FSCSC to count toward its obligations under the Support Agreement. Sections 3.1 and 5.1 of the Support Agreement require that any payments by FSCSC to SMOW comply with the terms,

---

[2] The Defendant's Responses to the Bank's Statement of Facts, paragraphs 17,18 and 25, are non-responsive and constitute admissions. Paragraphs 17, 18 and 25 of the Bank's Statement of Facts are admitted because FSCSC never addressed the factual allegations made therein. *Sandefur v. Village of Hanover Park*, 862 F. Supp. 2d 840, n.1 (N.D. Ill. 2012) (legal arguments or other argumentative answers are not sufficient to support denial); *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000) ("[A] general denial is insufficient to rebut a movant's factual allegations; the nonmovant must cite specific evidentiary materials justifying the denial. If the cited material does not clearly create a genuine dispute over the movant's allegedly undisputed fact, the nonmovant should provide an explanation.").

conditions, and provisions of the Support Agreement to count toward FSCSC's obligations. (P's SOF Ex. B, Support Agreement, § 3.1 ("The Required Amount shall be reduced by each transfer made to [SMOW] . . . <u>pursuant to this Support Agreement</u>."); § 5.1 ("This Support Agreement shall be in full force and effect until the earlier of: (i) the date when the Required Amount shall have been paid <u>in accordance with Article III</u> . . . .") (emphasis added).) Absent payments by FSCSC "pursuant to" or "in accordance" with the requirements of the Support Agreement, the payments do not count toward FSCSC's obligations. Section 3.2(d) provides the only mechanism by which FSCSC can satisfy its obligations under the Support Agreement when making payment to SMOW. Section 3.2(d) conditions FSCSC's right to make any transfers to SMOW under the Support Agreement upon receipt of "a written request" from SMOW that includes all of the requirements set forth in (i) through (iv). Further, SMOW is to furnish a copy of each such request to the Bond Trustee and the Bank at least three business days "<u>before any transfer is to be made pursuant to this subparagraph (d)</u>." (P's SOF Ex. B, Support Agreement ¶ 3.2(d).)

FSCSC asks the Court to ignore these provisions and to accept its argument that all of its payments were made "under the Support Agreement" even though FSCSC has not established that the requirements of Section 3.2(d) were satisfied. FSCSC never alleges that notice was given by SMOW to it or to the Bank; not a single document has been produced that evinces any type of written request, let alone a piece of paper that contains all of the required information. In sum, the undisputed material facts show that none of the payments by FSCSC satisfy the terms of Section 3.2(d)(i)-(iv). Accordingly, FSCSC's payments do not reduce FSCSC's obligations under the Support Agreement as a matter of law and the Bank is entitled to summary judgment. (*See* Bank's SJ Memo., Dkt. 44, pp. 8-12.)

3

DM3\2859388.7

**C.    The Only Relevant Fact is That Notice Was Not Provided**

FSCSC argues that it was SMOW's obligation to provide notice under the Support Agreement, not FSCSC's, and that the Bank never requested notice of compliant payments under the Support Agreement, offering these points as excuses for why it should not be held liable under the Support Agreement. (D's Response p. 10.) These arguments ignores the plain terms of the Support Agreement, which neither require the Bank to request the notice, or eliminate FSCSC's obligations in the event notice was not given. (Bank's SJ Memo., Dkt. 44, pp. 8-12.) FSCSC is under the misapprehension that its liability is somehow predicated on its own obligation to provide notice under the Support Agreement; FSCSC addresses the Illinois standard for piercing the corporate veil, which is irrelevant. The Bank's point is that notice is required by the Support Agreement, and in the absence of very specific notice from SMOW, payments made by FSCSC to SMOW or for its benefit are not counted towards FSCSC's obligations under the Support Agreement. The Bank does not have to show that FSCSC somehow was obligated to provide the notice, through piercing the corporate veil or otherwise—it is enough that the notice was not given. The Support Agreement is unambiguous; FSCSC cannot make a payment that counts toward its obligations "under the Support Agreement" absent the required notice under Section 3.2(d).

Assuming, *arguendo*, that who bore the responsibility for giving the notice is somehow outcome determinative, FSCSC's placing blame upon SMOW for the failure to give notice is disingenuous at best. FSCSC submits the declarations of Ronald Tinsley and Richard Truesdale in support of its arguments. Tinsley is the chief financial officer of FSCSC *and the treasurer of SMOW*. (Tinsley Supp. Dec. ¶¶ 1, 4.) Tinsley allegedly has "personal knowledge of SMOW's operations and financial conditions." (Tinsley Supp. Dec. ¶ 4.) Tinsley states in his supplemental declaration *that FSCSC operated SMOW*. (Tinsley Supp. Dec. ¶ 3.)

4

Truesdale is the controller of FSCSC and provided certain management and accounting services to SMOW. (Truesdale Supp. Dec. ¶ 2.) Truesdale states in his supplemental declaration that he "has personal knowledge of SMOW's operations, business transactions, finances, accounting policies and contracts." (Truesdale Supp. Dec. ¶ 2.) Truesdale makes statements in his Supplemental Declaration, presumably based on his *personal knowledge*, as to what <u>SMOW's normal course of business</u> was with respect to financial statements, and indicates that he personally prepared Memorandums to SMOW's bondholders "as a regular business activity" and that he "had knowledge of SMOW's financial operations at the time they were drafted." (Truesdale Supp. Dec. ¶¶ 10, 11.) He further states that he, personally, supervised the creation of SMOW's restated quarterly financial statements. (Truesdale Supp. Dec. ¶ 12.)

Inconsistent with the position taken by FSCSC in the above declarations, FSCSC states in its Response that the lack of notice under the Support Agreement cannot be attributed to it. (D's Response at p. 5.) And yet FSCSC goes to great lengths in its Response to Plaintiff's Motion to Strike the Declarations of Truesdale and Tinsley to establish their involvement with and knowledge of every aspect of SMOW's finances and business; FSCSC from the outset has taken the position that FSCSC operates SMOW. FSCSC cannot have it both ways. If FSCSC operates SMOW, if its employees and officers were, in fact, so involved with SMOW that they had "personal knowledge" of SMOW's operations and financial condition as set forth above and in its Response to the Motion to Strike, then FSCSC cannot now disavow the fact that FSCSC and its employees, officers and directors were the same people who, wearing a SMOW "hat," would or could have provided the required notices under the Support Agreement. FSCSC cannot argue, contrary to the plain terms of the Support Agreement, that because it was SMOW's obligation to provide notice and not its own, it is somehow excused from performance under the Support Agreement. That is not what the Support Agreement provides, or what the facts here establish.

5

**D.      The Bank's Knowledge That FSCSC Supported SMOW Is Not Determinative**

FSCSC argues that because the Bank's internal documents reflect that it had knowledge that FSCSC was claiming that it had made certain payments to SMOW under the Support Agreement (which were not in compliance with Section 3.2(d)), and (a) made credit decisions with respect to the loan with that knowledge and (b) did not request that FSCSC and SMOW comply with the Support Agreement notice requirements, that the notice requirements were not material to the Bank.  (D's Response at pp. 6-10.)  Although FSCSC disavows that it is arguing waiver[3], (D's Response at pp. 14-15), the clear import of the argument here is that the Bank waived the notice provisions through its course of conduct.  FSCSC attempts to slant its argument away from waiver, instead focusing on the materiality of the notice provisions, because the terms of the Support Agreement (i) are clear, (ii) have not been complied with, and (3) preclude waiver.

   **1.      Sections 4.1, 6.1 and 6.3 of the Support Agreement Bar Waiver**

FSCSC affirmatively represented in Section 4.1 that its obligations were "absolute and unconditional" and its obligations would not be affected, impaired, or modified because of the purported "waiver of the payment, performance or observance by FSCSC or [SMOW]" of any obligation under the Support Agreement, including, "(c) <u>the waiver of the payment, performance or observance by FSCSC, or [SMOW] . . . of any of the obligations, covenants or agreements of any of them contained in . . . this Support Agreement,</u> …..or (h)  the default or failure of FSCSC

---

[3] FSCSC asserted waiver as its second affirmative defense.  FSCSC offered no evidence to support its waiver defense in its motion for summary judgment.  FSCSC bears the burden of proving its affirmative defense at summary judgment.  Despite this, it offered no evidence in its motion.  *Zenith Elecs. Corp. v. Panalpina, Inc*., 68 F.3d 197, 201 (7th Cir. Ill. 1995); *see also McCarthy v. Option One Mortg. Corp*., 362 F.3d 1008, 1011 (7th Cir. 2004) (defendants had burden to establish affirmative defense of preemption on summary judgment).  FSCSC should not be allowed to raise facts to support its affirmative defense in its Reply having ignored this defense in its opening brief.  *Murphy v. Vill. of Hoffman Estates*, Case No. 95 C 5192, 1999 U.S. Dist. LEXIS 3320, *5-6 (N.D. Ill. March 15, 1999) ("[I]t is established beyond peradventure that it is improper to sandbag one's opponent by raising new matter in reply.").

fully to perform any of its obligations set forth in this Support Agreement . . . ." (P's SOF, Ex. B, Support Agreement, § 4.1(c) and (h) (emphasis added).)

FSCSC's promise to the Bank in Section 4.1 is expanded upon in Sections 6.1 and 6.3. Section 6.1 proscribes the very implication of waiver of any "provision of this Support Agreement or any right or remedy [under the Support Agreement] . . . from any action or inaction, course of dealing or otherwise." (P's SOF, Ex. B, Support Agreement § 6.1.) Any such waiver must be in writing. (P's SOF, Ex. B, Support Agreement § 6.1.) Section 6.3 of the Support Agreement unambiguously confirms the absolute bar of FSCSC's waiver argument, providing, in part that, "No waiver, amendment, release or modification of this Support Agreement shall be established by conduct, custom or course of dealing, but solely by an instrument in writing duly executed in accordance with the provisions of the Support Agreement." (P's SOF, Ex. B, Support Agreement § 6.3 (emphasis added).)

FSCSC's entire argument contravenes the express covenants in, and terms of, Sections 4.1, 6.1 and 6.3. Illinois law is crystal clear that these types of covenants are enforceable as written, thereby entitling the Bank to judgment in its favor as a matter of law. *See, e.g., Wis. Elec. Power Co. v. Union Pac. R.R. Co.*, 557 F.3d 504, 509-510 (7th Cir. 2009) (the waiver of a no-waiver clause must be "proved by clear and convincing evidence"); M*onarch Coaches, Inc. v. ITT Ind. Credit*, 818 F.2d 11 (7th Cir. 1987) (no waiver clauses are enforceable under Illinois law); *Roboserve, Inc. v. Kato Kagaku Co.*, 78 F.3d 266, 277-78 (7th Cir. 1999); *Kmart Corp. v. Footstar, Inc.*, Case No. 09 CV 3607, 2012 U.S. Dist. LEXIS 44360, *69-70 n.264 and 265 (N.D. Ill. March 30, 2012) ("Nonwaiver provisions are enforceable in Illinois 'and may be strictly construed even when full compliance with the contract has not been required for a lengthy period of time.'"); *see also Transcraft Corp. v. Anna Ind. Dev. Corp.*, 223 Ill. App. 3d 100, 101-103 (5th Dist. 1991) (enforcing no waiver clause and prohibiting finding of waiver

based on "failure to demand strict performance or to take advantage of any 'terms,' 'conditions,' or 'rights' was neither a 'waiver' nor the 'relinquishment' of the 'terms,' 'conditions,' or 'rights' within the contract"); *Bank of Am., N.A. v. 108 N. State Retail LLC*, 401 Ill. App. 3d 158, 172 (1st Dist. 2012) (guarantor's decision "to contractually agree to waive all defenses is permitted under Illinois law."); *BA Mortg. & Int'l Realty Corp. v. Am. Nat'l Bank and Trust Comp. of Chicago,* 706 F. Supp. 1364, 1376 (N.D. Ill. 1989) (striking affirmative defenses because defendant waived right to assert defenses in unambiguous guaranty agreement).

In addition to Illinois law enforcing the waiver provisions included in the Support Agreement, the Illinois Credit Agreement Act precludes unwritten modifications to the Support Agreement. 815 ILCS 160/1; Bank's SJ Memo., Dkt. 44, pp. 13-15. The Support Agreement's requirements cannot be waived—the agreement itself prohibits waiver, and the Illinois Credit Agreement Act bars modifications to the Support Agreement that are unwritten. FSCSC cannot avoid these conclusions by attempting to craft its argument in terms of materiality.

    **2.**    **The Notice Provisions in the Support Agreement are Material**

FSCSC's argument that Section 3.2(d) is a non-material notice provision is seriously misdirected. The Support Agreement is an integral part of a broader credit facility provided to SMOW, consisting of the Port Authority's bond issuance, the Letter of Credit, the Reimbursement Agreement, the Loan Agreement, and the Support Agreement. (P's SOF ¶¶ 7-10.) Adherence to the requirements and notice provisions of Section 3.2(d) is the only means by which FSCSC can satisfy its obligations under the Support Agreement with respect to payments to or on behalf of SMOW. The very purpose of the Support Agreement is to require FSCSC's financial support of SMOW; it supports the ongoing operations of the facility during the course of the loan and is a source of repayment for SMOW's obligations under the loan. (P's SOF ¶¶ 7-10.)

The information required by Section 3.2(d) allows the Bank to monitor the funds available under the Support Agreement, and is a way for the Bank to track the performance of its collateral. (P's SOF ¶¶ 10, 20.) The Bank looked to the availability of cash under the Support Agreement in making decisions with respect to the loan. (P's SOF ¶¶ 10, 20.) It is difficult to conceive a more material term of the Support Agreement than Section 3.2(d), which governs how and under what circumstances FSCSC was to provide support to SMOW. Ms. O'Dell's testimony explaining the materiality of Section 3.2(d) remains unrebutted. (O'Dell Dec. ¶ 11; P's SOF ¶ 20[4]; *see also* O'Dell Supp. Dec. ¶ 28, Ex. O, Customer Review Report, Feb. 3, 2010, (noting approval of renewal of Letter of Credit based on ongoing support of FSCSC; noting that "due to the Operating Support Agreement on SMOTW, no reserve beyond the charge-off amount is recommended); O'Dell Supp. Dec. ¶ 28, Ex. P, Customer Review Report, May 21, 2010 (no additional Specific Loan Loss Reserve was due to the Support Agreement). Section 3.2(d) would not serve its purpose at all if FSCSC could retroactively classify payments as being under the Support Agreement.

**E.     Notice Was A Condition Precedent**

Satisfaction of the requirements in Section 3.2(d) is a condition precedent to FSCSC's right to transfer any cash to SMOW that would qualify as a reduction of FSCSC's obligations under the Support Agreement. "Illinois courts define a condition precedent as one which must be performed either before a contract becomes effective or which is to be performed by one party to an existing contract before the other party is obligated to perform." *MXL Ind., Inc. v. Mulder*, 252 Ill. App. 3d 18, 25 (2d Dist. 1993). (Bank's SJ Memo, Dkt. 44, pp.10-12.) The only way that FSCSC's payments to or on behalf of SMOW can count against its obligations under the

---

[4] A review of FSCSC's Response to Plaintiff's Statement of Facts reveals that it never rebuts or denies what the Bank considers material in evaluating a credit. (D's Res. to P's SOF ¶ 20.) Nor could it.

9

Support Agreement is for notice to be given as specifically required *before the transfer is made*. It is not that the Bank would have objected to a transfer (that it irrelevant)—it is because the Bank needed (and was entitled) to know what was available under the Support Agreement in evaluating the credit and making decisions. The Bank (and for that matter the Bond Trustee) was relying on availability under the Support Agreement. (PSOAF ¶¶39.) It was critical to the loan. (P's SOF ¶8-12, 20.) Because the requirements in Section 3.2(d) were not complied with, FSCSC is not entitled to offset any of the $3.7 million against its obligations.

The cases FSCSC cites with respect to materiality of notice are inapposite. Not only was the notice here material—it was a condition precedent to FSCSC getting credit against is obligations under the Support Agreement for monies it was putting into SMOW. In *Rogers v. Balsley*, 608 N.E.2d 1288 (Ill. App. 2d Dist. 1993), the court found that written notice that was received in a timely fashion, but was sent to the plaintiffs' attorney instead of their home address as required under the contract, was sufficient. The case involved a residential real estate sale, and the purchaser failed to provide notice of its inability to obtain financing; the court noted that equitable principals prevent forfeiture in such a situation. Similarly, *Vole, Inc. v. Georgacopoulos*, 538 N.E.2d 205 (Ill. App. 2d Dist. 1989), found a default did not occur where notice was actually received, but not sent by registered mail as required by the contract.

In *Kmart Corp. v. Footstar, Inc.*, 09 CV 3607, 2012 U.S. Dist. LEXIS 44360 (N.D. Ill. Mar. 30, 2012), the court addressed whether Kmart timely provided Footstar (which operated footwear departments in Kmart's stores) with a demand for indemnification, and is not analogous to the obligations under Section 3.2(d) of the Support Agreement. *Arrow Master, Inc. v. Unique Forming, Ltd.*, 12 F.3d 709 (7th Cir. 1993), concerned the sale of plaintiff's business and assets. The seller was required to send notice to third party foundries that held the seller's dies. While notice was sent, the letter did not comply exactly to the notice requirement. The court found that

10

the lack of more specific information in the letter was not material breach. None of these cases involved notice that was used to track compliance with contractual obligations that formed the core of the agreement—the whole point of the Support Agreement was how and when FSCSC was required to support SMOW.

F.  **FSCSC's Assertions That It Had Contributed Money Under the Support Agreement Do Not Defeat The Bank's Motion for Summary Judgment**

1.  **The Customer Review Reports Parrot FSCSC's Representations to the Bank**

The central point of FSCSC's argument is that the Bank's internal Customer Review Reports reflect the Bank's knowledge that FSCSC had contributed money to SMOW under the Support Agreement. (D's Response pp. 7-8.) FSCSC's reliance on the Customer Review Reports is misplaced. The Bank's Customer Review Reports reflect that FSCSC had informed employees of the Bank that *FSCSC was characterizing* certain payments it had made to, or on behalf of, SMOW as being made under the Support Agreement. (*See, e.g.,* PSOAF ¶¶ 18-24.) The Customer Review Reports typically are drafted by the workout officer assigned to a loan and are designed to apprise the Central Loan Committee and/or the Executive Risk Committee of what was happening with a particular loan on a quarterly basis. The workout officer in this case, Vicki Woodard, is not a lawyer and did not make legal decisions for the Bank. The fact that FSCSC employees or officers were asserting that various payments were to be credited under the Support Agreement is not indicative of whether the payments were sufficient as a matter of law to be payments made under the Support Agreement. And Ms. Woodard's reporting of what was told to her by FSCSC employees does not constitute a legal conclusion that such was the case. (PSOAF ¶¶ 9-11.) This type of informal interaction, with no checks and balances, is precisely what the Support Agreement's requirements protected against.

11

### 2. FSCSC Only Attributed $1,050,000 To The Support Agreement

A full review of the documents relied upon by FSCSC reveals that even should these Customer Review Reports constitute some type of waiver (which as set forth, *supra*, and in the Bank's opening brief, they cannot) the most that can be said is that FSCSC told the Bank that only $1,050,000 of the $3 million was contributed to SMOW under the Support Agreement, leaving a balance due and owing of $1,950,000. (*See* PSOAF ¶¶ 16-24 identifying Customer Review Reports dated Nov. 16, 2009, Dec. 8, 2009, Sept. 8, 2010, Nov. 15, 2010, and June 28, 2011 (each of which sets forth that FSCSC had asserted that a maximum of $1.050 had been drawn under the Support Agreement).)

The July 26, 2011 Customer Review Report reflects availability of $1.950 million under the Support Agreement. (PSOAF ¶¶ 12-13.) It was this Customer Review Report that requested approval for the last August 2011 extension to the Letter of Credit, and the approval request clearly was predicated on $1.950 of availability under the Support Agreement. (PSOAF ¶¶ 12-13.) The Bank approved the extension of the Letter of Credit before SMOW's financial statements were restated in August of 2011 to provide that all amounts available under the Support Agreement had been drawn. (PSOAF ¶¶ 12-14.) The restatements were done at the time FSCSC and SMOW were initiating negotiations for the restructuring of the SMOW Bonds. SMOW stopped servicing its debt in October 2011, and filed for bankruptcy protection in November 2011. (PSOAF ¶¶ 14-15.) The later references in the Customer Review Reports (post-July 2011) state only that "management [FSCSC] informed debt holders that financial reports backdating to April 2011 would need to be restated. Liquidity had previously been reported in compliance with $1.950M remaining untapped under the original $3MM support agreement, to be used to maintain 90 days cash on hand at the community at all times." (PSOAF ¶¶ 16, Customer Review Report, Sept. 13, 2011; Customer Review Report, Nov. 29, 2011.)

Assuming that FSCSC's argument on waiver or knowledge should be considered at all, at most, the Customer Review Reports show that FSCSC considered only $1,050,000 as having been drawn on the Support Agreement. It cannot be said that the Bank ever thought that or relied upon the entire Support Agreement having been drawn. That slight-of-hand was completed by FSCSC in the 2011 Restated Financial Disclosures, when it was convenient for it to do so, after bankruptcy (or at the very least significant restructuring) was a foregone conclusion and it no longer was attempting to keep the loan out of default. (PSOAF ¶ 15; P's SOF ¶ 24.) Once it no longer benefited FSCSC or SMOW to have availability under the Support Agreement, FSCSC went back and recharacterized all of the "support" that was being put into SMOW outside of the Support Agreement so that it would have no continuing liability to fund those amounts.

### 3. FSCSC Supported SMOW Outside of the Support Agreement

Prior to August 2011, FSCSC had intentionally attributed to the Support Agreement only a portion of the money it was putting into SMOW. In a Memo to Bondholders dated October 25, 2010, Richard Truesdale states that "[t]he balance of the support agreement at September 30, 2010 is $1,950,000." (PSOAF ¶ 29.) In the "Cash on Hand" summary attached to that notice, the amount of $771,208 is reflected as "amount funded in excess of support agreement." (PSOAF ¶ 29) The Bank's internal Customer Review Reports reveal that FSCSC was putting money into SMOW, but choosing not to put it in under the Support Agreement. It did this because the availability under the Support Agreement was being used to calculate the Days Cash on Hand covenant. For instance, the Customer Review Report dated November 15, 2010 notes that in exchange for extending the maturity date of the Letter of Credit, "FSCSC will maintain the $1.950M in availability under the existing support agreement for 90 days cash on hand

13

minimum at SMOTW. *Cash shortfalls will be funded <u>separately</u> through maturity.*" (PSOAF ¶ 30 (emphasis added).)

    4.    **Availability Under the Support Agreement Was Used to Calculate Days Cash on Hand Covenant**

FSCSC and SMOW chose to use availability under the Support Agreement to calculate a covenant under the loan documents, the "Days Cash On Hand" or "DCOH" covenant. (*See, e.g.,* PSOAF ¶ 28, 2/12/10 Email Correspondence from Ms. Woodard to Mr. Zimmer at FSCSC (discussing amendment to DCOH covenant); PSOAF ¶ 30, Customer Review Report, Nov. 15, 2010 ("FSCSC will maintain the $1.950M in availability under the existing support agreement for 90 days cash on hand minimum at SMOTW"); PSOAF ¶ 32, Customer Review Report, June 28, 2011 (noting that "$1.950 million remains untapped under original $3MM agreement and is used to maintain a minimum of 90 days cash at the community as all times.").) This is supported by a Memo Richard Truesdale sent to the Bond Holders dated August 16, 2010, and in all of the original and restated financial statement disclosures that reference "Key Debt Covenant Ratios" and show the noncompliance with the Days Cash on Hand covenant once the Support Agreement availability is reduced to zero. (*See,* PSOAF ¶ 34.) The following chart summarizes the effect of the full draw under the Support Agreement on the Days Cash on Hand covenant:

| **Original Financial Statement Disclosure (Showing Availability Under Support Agreement)** | **Restated Financial Statement Disclosure (Support Agreement Fully Drawn)** |
|---|---|
| Quarter Ending Sept. 30, 2010, DCOH:<br><br>***Actual 123.97, Covenant 75*** | Quarter Ending Sept. 30, 2010, Restatement Aug. 3, 2011, DCOH:<br><br>***Actual 31.7, Covenant 75*** |
| Quarter Ending Dec. 31, 2010, DCOH:<br><br>***Actual 137.62, Covenant 75*** | Quarter Ending Dec. 31, 2010, Restatement Aug. 3, 2011, DCOH:<br><br>***Actual 48.6, Covenant 75*** |
| Quarter Ending March 31, 2011, DCOH: | Quarter Ending March 31, 2011, Restated Aug. |

| | |
|---|---|
| ***Actual 123.34, Covenant 75*** | 3, 2011, DCOH:<br><br>***Actual 35.6, Covenant 75*** |
| Month Ending April 30, 2011, DCOH:<br><br>***Actual 127.83, Covenant 75*** | Month Ending April 30, 2011, Restatement Aug. 3, 2011, DCOH:<br><br>***Actual 40.3, Covenant 75*[5]** |

The payments FSCSC retroactively applied to its obligations under the Support Agreement in August of 2011 were always intended by FSCSC to be *outside of the Support Agreement*. Had the payments been treated as having been made under the Support Agreement, SMOW would not have had the cash available to satisfy the Days Cash on Hand covenant under the Loan Agreement, which would have triggered a default as early as 2010. (PSOAF ¶ 36, 37.) FSCSC and SMOW treated FSCSC's payments as having been paid outside the formal requirements of the Support Agreement so that SMOW would not default on its Loan Agreement covenants. (PSOAF ¶ 38.) Not only did the Bank rely on the accuracy of SMOW's covenants, but so too did the other participants in the credit facility, such as the Bond Trustee. (PSOAF ¶ 39.) When maintaining availability under the Support Agreement no longer benefited FSCSC, however, FSCSC restated SMOW's financials in August 2011 such that it treated all of the earlier contributions to SMOW totaling nearly $2.4 million as having been made under the Support Agreement. FSCSC's revisionist treatment of the amounts it put into SMOW does not make them payments under the Support Agreement and they were never intended as such. To retroactively reclassify payments in the manner FSCSC suggests would, arguably, work a fraud on the Bank and other credit facility providers.

---

[5] (*See* PSOAF ¶ 35.)

15

## II. CONCLUSION

**WHEREFORE**, Plaintiff, Santander Bank, N.A. (f/k/a Sovereign Bank, N.A.) prays that this Court: (1) deny Defendant's Motion for Summary Judgment, (2) grant summary judgment in favor of Plaintiff, and (3) grant any additional relief the Court deems just and proper.

            **SANTANDER BANK, N.A. f/k/a**
            **Sovereign Bank, N.A.**


            By: /s/ *John Robert Weiss*
                    One of its Attorneys

John Robert Weiss
DUANE MORRIS LLP
190 South LaSalle Street, Suite 3700
Chicago, IL 60603
(312) 499-6700
(312) 499-6701 (fax)

16

## **CERTIFICATE OF SERVICE**

    John Robert Weiss, an attorney, certifies that on April 1, 2014, he caused the foregoing document to be served by electronic mail through the Court's ECF filing system upon:

>Bruce A. Radke, Esq.
>VEDDER PRICE PC
>222 North LaSalle Street
>Chicago, IL 60601
>bradke@vedderprice.com

                              /s/ *John Robert Weiss*